(34 Misc. Rep. 321.)

## BERNHEIM v. KEPPLER.

(Supreme Court, Special Term, New York County. March, 1901.)

STOCK EXCHANGE—DEATH OF MEMBER—SALE OF MEMBERSHIP.

Where the New York Stock Exchange, on the death of a member, sells his membership, and subsequently from the proceeds pays a debt due to one who was not at the time of the death of the member a member of the exchange, but subsequently became so, an answer, in an action by the administrator of the deceased member to recover the proceeds of the sale, that the committee on membership of the exchange disposed of the membership on the death of the member, and made the payment complained of, as provided by the constitution, presents no defense, as the constitution applies only to transactions between members.

Action by Henry C. Bernheim, administrator, against Rudolph Keppler, president of the New York Stock Exchange. Heard on demurrer to answer. Demurrer sustained.

Ivins, Kidder & Melcher and Henry Wollman (William M. Ivins, Henry Wollman, and Eugene Delmar, of counsel), for plaintiff.

Carter & Ledyard (Lewis Cass Ledyard, of counsel), for defendant.

LEVENTRITT, J. This action is brought against the New York Stock Exchange to recover the proceeds realized from the sale of the membership of the plaintiff's intestate, which, it is claimed, were improperly, and in violation of the constitution of the Stock Exchange, paid to one Levy, likewise a member. It is conceded that the claim of Levy arose out of transactions had between him and the plaintiff's intestate prior to the latter's admission to membership in the exchange, and that it did not arise out of any transaction upon the floor of the exchange; in other words, it was the liability of a nonmember who afterwards became a member. The answer sets up the payment of the proceeds to Levy after proceedings duly had, relying on certain sections of the constitution in justification.

The demurrer raises simply a question of the construction to be given to the constitutional provisions. Plaintiff's intestate, as a condition of acquiring membership, had to sign the constitution,—a contract between him and the association,—and its provisions became binding upon him. Section 4 of article 13 reads:

"When a member dies, his membership may be disposed of by the committee on admissions; and, after paying the claims of the members of the exchange as allowed by said committee on admissions, it shall pay any balance to the legal representatives of the deceased."

This is the single section of the constitution specifically applicable to the case. On its face, the language is broad, providing for the payment of the claims of members without limitation. I take it that there is no dispute—nor could there validly be—that, upon claims between members within its jurisdiction, the decision of the committee on admissions is final; each member, by his contract of membership, binds himself to accept and abide by its decisions. It is not, however, the judge of its own jurisdiction. It could not be, as that would be usurping the authority of the court. The question here is, to what claims does its jurisdiction, under the constitution,

pursuant to which it acts, extend? In its last analysis this case reduces itself simply to the interpretation of a contract between two parties, in which the court is called upon to glean their intention from all the facts disclosed. Obviously, an essential element disclosing intention is the purpose the parties had in entering the contract, or, more accurately, perhaps, the purpose for which the defendant established its voluntary association. The entire contract is given by the constitution, which became binding upon both parties when the plaintiff's intestate signed it. No specific provision of the constitution enumerates the purpose or purposes for which the exchange was organized. Judicial construction, however, has declared the New York Stock Exchange to be "a voluntary association of individuals, united, without a charter, in an organization for the purpose of affording to the members thereof certain facilities for the transaction of their business as brokers in stocks and securities, and a convenient exchange or salesroom for the conduct of such transactions. * * * It seems most clear * * * that this constitution and the by-laws derive a binding force from the fact that they are signed by all the members, and that they are conclusive upon each of them in respect of the regulations of the mode of transaction of his business, and of his right to continue to be a member." Belton v. Hatch, 109 N. Y. 593, 596, 17 N. E. 225.

The members united in this voluntary association have no business interests in common. They have joined together to facilitate the conduct of the business which each member carries on separately and on his own account, and in so doing enters into certain definite business relations with his fellow members. An incidental purpose, but of great importance to the business and investing community, and one which is quite apparent from a variety of provisions of the constitution, is the maintenance of a high standard of integrity and commercial honesty among the members, and the protection, as far as may be, against financial irresponsibility. This is manifest from the disciplinary provisions of the constitution, as well as from those creating safeguards against members deemed insolvent. A careful perusal of the entire constitution fails to satisfy me, however, that such a claim as was here allowed by the committee on admissions is within the protection of the constitution, or was contemplated in the compact. "It would seem entirely reasonable," says a text writer, "to confine and limit the jurisdiction of the stock exchange to those matters which arise between its members in the course of their business with each other as brokers." Dos P. Stockbrokers, etc., 75. This proposition is certainly consonant with the purposes for which the association was formed, is patent from a reading of the instrument vitalizing it, and should not be extended to the detriment of one of the contracting parties, unless the language of the provision invoked unmistakably intends it. The claims of members that are to be satisfied out of proceeds of the sale of a decedent's seat are, in view of the limitation indicated, not all claims, of whatever nature and description. To give full effect to the construction contended for by the defendant would be to include claims arising in tort from matters entirely unrelated to the business

of the exchange; claims derived through assignments from third persons who happen to have demands against a member; in fact, any and all rights whatsoever which one may have against another, irrespective of the time and mode of their creation or acquisition, and dependent solely on the circumstance that both should be members of the exchange when one of them dies.

A reading of additional sections of the constitution relating to the disposition of a member's "seat" in cases other than death, and in which claims, in one form or another, are allowed in favor of other members of the exchange, shows the propriety of the limitation here adopted. Thus, article 9, § 1, subd. 5, provides for an arbitration committee, whose duty it is to investigate and decide "all claims and matters of difference between members of the exchange which may be brought before them, and arising from transactions in bonds, bullion, stocks, or other securities, or from any transaction in money." It is quite clear that the "all claims" here referred to are such only as invoke stock exchange transactions, and that the arbitration committee would have no jurisdiction over the claim here allowed by the admissions committee. Article 14, § 4, provides that, where a suspended member fails to settle with his creditors within one year from the time of his suspension, his membership shall be disposed of by the admissions committee, "and the proceeds applied to the payment of his debts in the exchange, as allowed by said committee." Here, again, the meaning of the provisions seems obviously restricted to the debts contracted among members as such. Article 13, § 6, provides that "all contracts, debts, or obligations of every description, with or to members of the exchange, of a member who agrees to transfer his membership, shall become due and payable when notice of said agreement to transfer is posted upon the bulletin of the exchange, and shall be liquidated and paid, as allowed by the committee on admissions, out of the proceeds of said membership, upon consummation of the transfer thereof. This law shall also apply in every case where a membership is transferred by the committee on admissions." This is quite the broadest section of the constitution, and seems to be relied on by the defendant even more than the one specifically applicable to the case of death. It is argued that no language could be more comprehensive than "all contracts, debts, or obligations of every description." Standing alone, this is, perhaps, true; but this construction leaves out of consideration the words of obvious limitation immediately following,— "shall become due and payable." To my mind, this purports current contracts, debts, or obligations between members, and originating between them in their membership capacity. Claims long since accrued would not first have to be declared due and payable. Section 5 of article 13, immediately following that under which action was taken in this case, and which applies to the case where one is deprived of membership, provides, like the preceding section, for its disposal for the benefit of the members, and makes similar provision for the payments of members' claims, except that it is, if anything, broader, by the use of the term "all claims," as against "claims" only, in the earlier section. But I think it must be clear,

whether claims, debts, contracts, or obligations are referred to, that those only are contemplated which arise from dealings between members as such. An association formed to furnish a convenient trading place, and to regulate the transactions among those belonging to it, seems to have fulfilled its obligation to afford to its members the protection here under discussion by imposing, as a burden of the membership contract, a lien on the proceeds of the membership to the extent of claims growing out of transactions had by a member with other members. It may well be that, pursuant to one of the secondary purposes of such an association,—to inculcate and maintain high principles in trading,—it is advisable that members shall meet their just obligations, of whatever description. The good standing of a prospective member is, however, matter of investigation before admission. Once in, the association concerns itself only in his outside business affairs to the extent of an inquiry as to solvency. Beyond that there is no constitutional provision directed against his obligations to others, and in the absence of clear, unmistakable language in the contract which the member signed, neither reason nor justice requires that the special privilege which one member has in the proceeds arising from the disposition of another's membership should be enlarged.

I find a great similarity between this case and that of Cochran v. Adams, 180 Pa. 289, 36 Atl. 854, involving the construction of certain provisions of the Philadelphia Stock Exchange constitution. That provided that, upon death, the proceeds of a membership should first be applied in payment of the claims of the owner's creditors who were members of the exchange. The arbitration committee, however, passed upon the claims, instead of the admissions committee, as in the case of the defendant. The other powers of the arbitration committee were summed up in a section practically identical with that concerning the arbitration committee in the defendant's constitution. The debt or claim passed upon in Cochran v. Adams was, like that at bar, one arising outside of exchange transactions. The arbitration committee allowed the claim, but the supreme court held otherwise, declaring the purpose of the provisions construed to be "to provide for settlement of claims pertaining to the business of said exchange." While it is true that the particular limitation of the powers of the arbitration committee in other matters was accepted as conclusive upon the construction adopted, the construction was not made dependent upon it, but rather fortified by it. The result of that decision is practically the same as that arrived at in this case, and both seem to be in accordance with the spirit of the respective constitutions, and are expressive of my own notion of justice. The demurrer is sustained, with costs.

Demurrer sustained, with costs.